UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CAITLIN S.,

Plaintiff,

                                                **Case No. 1:21-cv-00892-TPK**

     v.

COMMISSIONER OF SOCIAL                     **OPINION AND ORDER**
SECURITY,

Defendant.

## OPINION AND ORDER

Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on June 14, 2021, denied Plaintiff's application for disability insurance benefits. Plaintiff has now moved for judgment on the pleadings (Doc. 11), and the Commissioner has filed a similar motion (Doc. 12). For the following reasons, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## I.  BACKGROUND

Plaintiff filed her application for benefits on June 25, 2018, alleging that she became disabled on January 1, 2017, which date was later amended to April 21, 2018. After initial administrative denials of that claim, a hearing was held before an Administrative Law Judge on March 13, 2020. Plaintiff, her daughter's grandmother, and a vocational expert, Brian Daly, testified at the hearing.

The Administrative Law Judge issued an unfavorable decision on April 17, 2020. He first found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2022, and that she had not engaged in substantial gainful activity since her amended alleged onset date. Next, he concluded that Plaintiff suffered from severe impairments including right intracranial hemorrhage, major depressive disorder, and panic disorder with agoraphobia. However, the ALJ determined that these impairments, taken singly or in combination, did not meet the criteria for disability under the Listing of Impairments.

Moving forward with the sequential evaluation process, the ALJ then concluded that Plaintiff had the ability to perform a reduced range of light work. She could occasionally lift and frequently carry ten pounds, could stand and walk for four hours in a workday, could sit for six hours, could occasionally push and pull with the left upper and lower extremities, could occasionally climb ramps and stairs, could not climb ladders, ropes, or scaffolds, and could

occasionally balance stoop, kneel, and crouch, but never crawl.  Also, she had to avoid hazards like heights and moving machinery, and she could perform only simple, routine tasks.

The ALJ further concluded that Plaintiff had no past  relevant work but, relying on the vocational expert's testimony, the ALJ determined that, given her vocational profile and with the limitations described above, Plaintiff could perform certain light jobs such as document preparer, cutter/paster, and call-out operator.  He also found that these jobs existed in significant numbers in the national economy.  As a result, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in her motion for judgment on the pleadings, raises two issues, stated *verbatim* as follows:

> (1) The Administrative Law Judge's (ALJ) erred by improperly evaluating opinion evidence. He found a treating opinion persuasive, despite it consistent with and supported by evidence. The left the residual functional capacity (RFC) not supported by substantial evidence.

> (2) The ALJ failed to reconcile an opinion he found persuasive, with the RFC. He needed to either explain why he rejected it or include it in the RFC.

Plaintiff's Memorandum, Doc. 11-1, at 1.

## II.  THE KEY EVIDENCE

### A.  Hearing Testimony

Plaintiff, who was 26 years old at the time of the administrative hearing, first testified that she lived in a house with her four-year-old daughter.  Plaintiff completed the eleventh grade in school and had culinary arts training in high school.  She had held a few part-time jobs but had not worked since 2017.  In 2018, she had a stroke which led to a lengthy period of hospitalization and rehabilitation.  The stroke affected her ability to walk and her memory and concentration.  She had therapy to learn how to walk as well as speech therapy.  After the stroke, she had difficulty caring for her daughter.

When asked about current problems, Plaintiff said she tired easily and had trouble carrying objects.  Her daughter's grandmother helped her with child care and household chores.  She also helped Plaintiff remember to take her medication.

During a typical day, Plaintiff did some light housekeeping and took care of her dogs.  She said that physically, she believed she could work, but her mental difficulties prevented her from getting a job.  She did not really have friends in the area to socialize with, but she did spend time on Facebook.

Carey Laird, Plaintiff's daughter's grandmother, testified that she had moved in with Plaintiff because Plaintiff was unable to care for herself. She had first moved in when Plaintiff was hospitalized, moved out for a time, and then moved back in after it became apparent that Plaintiff could not be left alone. Ms. Laird said that Plaintiff was often confused and had memory problems. She also slept a lot and had trouble making decisions or following directions. Ms. Laird also paid all of Plaintiff's bills and noted that Plaintiff had unusual emotional responses after her stroke. Additionally, she had problems with her balance and would become disoriented at times.

The vocational expert, Brian Daly, was asked to assume that Plaintiff had no past relevant work. He was then asked questions about a hypothetical person with Plaintiff's vocational profile who could do light work with a ten-pound lifting and carrying limit and who could walk and stand for four hours per day and sit for six. The person would also have some limits on pushing and pulling with the left arm and leg, some postural limitations, restrictions on working around hazards, and would be limited to simple, routine tasks. Mr. Daly said that such a person could do jobs like document preparer, cutter and paster, and call-out operator, all sedentary jobs. None of those jobs could be done, however, by someone who would be off task for 15% of the time, or who needed frequent reminders throughout the workday.

## B. Treatment Records

The pertinent medical treatment records show the following. As noted above, Plaintiff was hospitalized for a stroke in 2018, and there are voluminous medical records from that hospitalization as well as from the subsequent rehabilitation and therapy she received. For the most part, Plaintiff's memorandum concentrates on other treatment records evaluating her progress post-hospitalization, and the Court will do the same here.

On July 30, 2018, Plaintiff was seen at Family Health Medical Services after undergoing a craniotomy/cranioplasty. She had just been discharged from rehabilitation and said she could now walk up to 500 feet with a walker, but with bilateral foot drop and some balance issues. She also had problems with her short term memory. Several months later, she reported experiencing depression and anxiety but she was taking her medications regularly. She still had left-sided weakness and foot drop. By October, she was walking with a cane, and her gait without the cane was unsteady and she was at moderate risk for falling. She was starting on a home exercise program.

Plaintiff began seeing Dr. Esper on December 5, 2018. She was still reporting issues with anxiety and depression, but she walked with a normal gait and her mood and affect appeared normal. Dr. Esper observed that she had both cognitive issues as well as significant anxiety and depression. He saw her again in June, 2019, and noted that she still walked with a normal gait and that her mood, affect, attention span, and concentration were all normal. She was having fatigue and was started on a new medication. In November of that year, she was reporting some atonic spells with the new medication but less drowsiness. Plaintiff was concurrently receiving mental health treatment from the Chautauqua County Department of

Mental Hygiene, which included both counseling and medication. Her conditions were typically described as stable or improved but she was still reporting anxiety when out in public or in crowded spaces. In early 2020, she said that her depression and anxiety were getting worse.

### C.  Opinion Evidence

Dr. Ippolito, a psychologist, conducted a consultative psychiatric evaluation on September 20, 2018. Plaintiff told Dr. Ippolito that she had been in treatment for anxiety and depression for about a year before having her stroke, and she was currently taking medication for depression and anxiety. She still experienced panic attacks and was having difficulty with concentration and memory since the stroke. On examination, her affect was dysphoric and her attention, concentration, and memory appeared mildly impaired. Dr. Ippolito thought that Plaintiff could understand, remember, and apply simple instructions, interact appropriately with others, sustain an ordinary work routine, and perform at a consistent pace. She had mild to moderate limitations in her ability to regulate her emotions, control her behavior, and maintain well-being, however. (Tr. 958-62).

The following week, Plaintiff saw Dr. Lee, a neurologist, for another consultative examination. She was wearing braces on both feet to address her foot drop and could walk only short distances. Plaintiff told Dr. Lee she could sit for two hours at a time, stand for 30 minutes, and walk for five minutes. She arrived at the examination in a wheelchair and needed assistance when moving about the examination room. Dr. Lee concluded that she had marked limitations in various areas including prolonged standing, walking great distances, bending, lifting, and carrying heavy objects. (Tr. 964-67).

Dr. Esper, a treating source, completed a stroke medical source statement in May, 2019. He listed Plaintiff's symptoms as balance problems, weakness, unstable walking, confusion, emotional lability, and speech/communication difficulties. She also had left facial droop, left arm drift, foot drop, anxiety, and chronic depression. Dr. Esper believed that she could walk three blocks without resting, stand for ten minutes at a time, stand or walk for less than two hours in a workday, and sit for two to six hours. She could occasionally lift and carry up to 20 pounds, and could occasionally stoop, crouch, and twist. Additionally, Plaintiff had to avoid concentrated exposure to fumes, odors, gases, and dust as well as all exposure to hazards. He did not believe she could do even low-stress work due to her depression and anxiety and said she would be off task for 25% or more of the workday. (Tr. 1163-66).

A state agency reviewing psychologist, Dr. Juriga, concluded on October 10, 2018, that Plaintiff had moderate limitations in her ability to understand, remember, and apply information as well as to concentrate, persist, or maintain pace due to her depressive and anxiety disorders. She did, however, retain the capacity for simple work. Dr. Lawrence, another state agency reviewer, stated on October 30, 2018, that Plaintiff could occasionally lift and carry up to ten pounds, stand and walk for four hours, sit for six hours, push and pull without limitation, and occasionally perform a number of postural activities. She also had to avoid concentrated exposure to hazards.

-4-

Finally, the record contains a medical opinion from Dr. Shaw, also a reviewing and non-examining source, dated May 17, 2019.  Dr. Shaw thought Plaintiff was limited to lifting and carrying ten pounds.  However, he did not think she could stand or walk for even two hours in a workday - in fact, he limited her to one hour of those activities - although she could sit for up to six hours.  She also had limitations on the use of her left side for pushing and pulling, she could never crawl or balance, she could only frequently finger with her left hand, and she had limited visual acuity and field of vision due to right-eye blindness, all of which applied subsequent to her stroke.  Finally, he indicated that his findings were not significantly different than those of Plaintiff's medical source.  (Tr. 1170-77).

## III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012).

## IV.  DISCUSSION

### A.  Evaluation of Opinion Evidence - Dr. Esper

In her first claim of error, Plaintiff argues that the ALJ did not properly evaluate either

the opinion of Dr. Esper, a treating source, or Dr. Shaw, a non-examining source.  More particularly, she contends that the ALJ erred when he found that Dr. Esper's opinion was not supported by and consistent with the other record evidence, and also erred by finding that Dr. Shaw's opinion did satisfy those two criteria.  The Commissioner responds to the first part of this argument by arguing that there was medical evidence from other sources which contradicted many of Dr. Esper's findings and that the single examination performed by Dr. Esper did not support his conclusions. Because Plaintiff's second claim of error also involves Dr. Shaw's opinion, the Court will discuss only Dr. Esper's opinion in this section.

The ALJ provided this explanation for how he weighed Dr. Esper's opinion.  The ALJ first found that Plaintiff's subjective description of her symptoms was not entirely consistent with the evidence.  He then credited Dr. Ippolito's opinion that Plaintiff could perform work activities from a psychological standpoint.  Turning to Dr. Esper's opinion, the ALJ said this:

> Jeffrey Esper, M.D., the claimant's treating provider, submitted a statement in which she (sic) opined the claimant could occasionally lift less than 10 pounds, occasionally twist, stoop, crouch, and rarely climb stairs. (Exhibit 27F). This opinion is not persuasive. The opinion is supported by a very short treatment history, reducing its longitudinal value. Further, the opinion is not consistent with the claimant's medical records that show the claimant moves all extremities with adequate strength, and gross sensation was symmetric throughout. She was alert and oriented to person, place, time and situation. (Exhibit 9F, 10F). She had full motor strength and no difficulty ambulating. (Exhibit 15F, 32F). Therefore, this opinion is not persuasive.

(Tr. 23).

This Court has explained how the regulations for evaluating expert medical opinions function after they were revised in March of 2017:

> First, the new regulations change how ALJs consider medical opinions and prior administrative findings. The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight.  Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).
>
> Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the most important factors are supportability and

consistency. *Id*.

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, the regulations also alter the way the ALJ discusses medical opinions in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

*Michael H. v. Comm'r of Soc. Sec.*, 2022 WL 768658, at \*5 (W.D.N.Y. Mar. 14, 2022).

As to Dr. Esper's opinion, the crux of the parties' first area of disagreement is whether the ALJ had a substantial basis for concluding that the opinion was inconsistent with other evidence in the record.  The Commissioner, in the opposing memorandum, points to a number of sources who reported that, from a physical standpoint, Plaintiff had a normal gait, could walk unassisted, had full muscle strength and sensation, and had adequate leg strength.  *See* Memorandum in Opposition, Doc. 12-1, at 14.  Also, as noted above, Plaintiff testified that she was physically able to work and that her major problems were psychological and cognitive. Plaintiff does not directly dispute the existence of this evidence, but argues that the ALJ engaged in a selective reading of the record and that his discussion of the supportability factor was either nonexistent or inadequate given the fact that findings made by Dr. Esper at his 2018 examination directly supported his conclusions.  She also argues that Dr. Esper's conclusions were, in fact, consistent with other treatment records, and that the ALJ erred by not addressing the consistency of Dr. Esper's opinions with the other opinion evidence.

Addressing this latter contention first, it is, of course, the case that "an ALJ is not required to 'reconcile explicitly every conflicting shred of medical testimony,' *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006)."  *Kevin F. v. Comm'r of Soc. Sec.*, 2020 WL 247323, at \*11 (N.D.N.Y. Jan. 16, 2020).  Nevertheless, in this case, the ALJ did discuss the various medical opinions and noted why he found some, like Dr. Esper's, unpersuasive, while crediting others.  For example, the ALJ clearly stated that he found the majority of the physical limitations expressed in Dr. Shaw's opinion persuasive because they were "supported by a direct examination of the claimant's medical records and consistent with the claimant's activities of daily living...."  (Tr. 23-24).  The ALJ also found Dr. Ippolito's consultative opinion persuasive and explained, again, that it was supported by the fact that Plaintiff was alert and oriented and by the findings made during Dr. Ippolito's direct examination of the Plaintiff.  Earlier in the decision, the ALJ cited numerous mental health findings which supported the conclusion that Plaintiff could withstand the mental demands of work, including her cooperative attitude, normal mood, appropriate affect, intact thinking and memory skills, and the fact that medication helped to alleviate her symptoms.  *See* Tr. 22.  The

Court does not agree with Plaintiff that the ALJ needed to provide a more explicit comparison of the medical opinions than was done in the decision.

As to Plaintiff's other contention, though, it is accurate to say that the ALJ's commentary on supportability was, at least with respect to Dr. Esper's opinion, sparse at best.  The ALJ did note that the length of the treating relationship cut against support for that opinion, but that is, as Plaintiff points out, a different factor to be used in evaluating opinion evidence. Under the applicable regulation, 20 C.F.R. §404.1520c(c)(1), the supportability factor is described this way: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  As Plaintiff argues, the ALJ did not discuss either the objective findings made by Dr. Esper or any of his supporting explanations.  The total failure to discuss one of the two important factors - factors which, by regulation, the ALJ "will explain," *see* 20 C.F.R. §404.1520c(b)(1) - has been held by some courts to constitute reversible error even when there is little evidence that is consistent with the opinion in question. *See, e.g., Richard R. v. Kijakazi*, - - - F.Supp.3d. - - -, 2023 WL  5949331 (D. Conn. Sept. 13, 2023) (addressing failure to discuss consistency factor).

The Commissioner argues, however, that any error in this regard is harmless, citing, in support of that argument, this Court's decision in *Sarah M.K. v. Comm'r of Social Security*, 2022 WL 4232880 (W.D.N.Y. Sept. 14, 2022).  The Court stated in that case, at *5, that

> [u]nder the new regulations, an ALJ's failure to adequately explain how he or she considered the supportability and consistency of a medical opinion in the record is procedural error. *Loucks* [*v. Kijakazi*], 2022 WL 2189293 [(2d Cir. June 17, 2022)] at *2. However, even if the ALJ commits such an error, the reviewing court may affirm if "a searching review of the record assures us 'that the substance of the [regulation] was not traversed.' " *Loucks*, 2022 WL 2189293 at *2 (*quoting Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (internal citation and quotation marks omitted)).

Here, as in *Sarah M.K.,* the ALJ engaged in a thorough review of the medical evidence and noted at several places how the objective evidence either did, or did not, support particular functional limitations.  As in that case, here, the Court is "satisfied that the ALJ was sufficiently familiar with the medical evidence from [Dr. Esper]" to have evaluated whether that evidence supported his opinion.  Under these circumstances, the Court finds that the substance of the applicable regulation has not been violated, and the claims concerning Dr. Esper's opinion therefore provide no basis for ordering a remand.

## B.  Dr. Shaw

Plaintiff makes two separate arguments about Dr. Shaw's opinion - first, that the ALJ erred in finding it to be persuasive, and, second, that the ALJ erred by not adopting the most restrictive portion of the opinion concerning Plaintiff's ability to stand and walk during the

workday.  She contends that his opinion was, for the most part, not consistent with nor supported by the evidence, and that the ALJ did not offer a good explanation for rejecting the standing and walking limitation.  The Commissioner asserts that an ALJ is not required to accept every part of an opinion which is, overall, persuasive, and that the record supports the ALJ's residual functional capacity finding.

Again, it is helpful to begin by examining the ALJ's rationale.  Here is what the ALJ said:

> Jay Shaw, M.D., opined that the claimant could perform sedentary work, but could occasionally climb ramps and stairs, balance, and kneel, and frequently stoop and crouch and never crawl....  This opinion is persuasive because the opinion is supported by a direct examination of the claimant's medical records and consistent with the claimant's activities of daily living that show the claimant is able to clean the house and take care of the needs of a pet dog.  She is able to perform personal hygiene....  For hobbies, she goes bowling, goes out to eat, goes to the mall, and listens to music....  The claim goes out two or three times per week.  She is able to ride in a car.

(Tr. 23-24).

It is important to note that nowhere did Dr. Shaw indicate that Plaintiff could "perform sedentary work" as the ALJ indicated.  Rather, he imposed lifting restrictions which are consistent with a limited range of sedentary work (*i.e.* frequently lifting and carrying ten pounds), said Plaintiff could sit for up to six hours, and most significantly, determined that she could stand or walk for a total of less than two hours in a workday - a restriction that is not consistent with sedentary work.  He explained this latter limitation by noting that it was supported by the evidence, including "balance problems, weakness, unstable walking ... gait disturbance from foot drop, able to walk three blocks before resting."  (Tr. 1175).

Although the Commissioner is correct that the ALJ did not automatically have to endorse all aspects of Dr. Shaw's opinion, what occurred here is something different.  The ALJ both failed to acknowledge the limitation in question and, as a result, provided no explanation for why it was not included in the residual functional capacity finding or why it was either inconsistent with or not supported by the record.  Unlike the situation with Dr. Esper's opinion, here, the Court cannot say with any degree of confidence that the ALJ faithfully applied the principles articulated in §404.1520c to this opinion, or that he even appreciated the fact that there was an inconsistency between the opinion and his residual functional capacity finding.  As this Court has said,

> An ALJ should ... explain why he did not include ... limitations [found in a medical opinion] in the RFC finding. *See, e.g., Linda H. v. Comm'r of Soc. Sec.*, No. 19-CV-1244-LJV, 2021 WL 2075437, at *3 (W.D.N.Y. May 24, 2021) ("Of course, the ALJ was not required to accept everything about which Dr. Liu

opined. But she was required to explain what parts of Dr. Liu's opinion she rejected and why. After all, when a medical source opinion conflicts with the RFC, 'the [ALJ] must explain why th[at] opinion was not adopted.' SSR 96-8p, 1996 WL 374184, at *7.")

*Phoebe B. v. Comm'r of Soc. Sec.*, No. 1:20-CV-01570 CJS, 2022 WL 4462228, at *7 (W.D.N.Y. Sept. 26, 2022). The ALJ's decision in this case is not consistent with that principle and thus constitutes legal error. It is not clear that, had the ALJ understood more correctly the limits expressed by Dr. Shaw, he would have arrived at the same residual functional capacity finding, nor is it clear that those limitations are consistent with the demands of the jobs identified by the vocational expert. The error here is therefore not harmless, and a remand to address this matter further is warranted.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 11), **DENIES** the Commissioner's motion (Doc. 12), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

**/s/ Terence P.  Kemp**
**United States Magistrate Judge§**